NATIONAL BANK OF ARKANSAS v. FEIBELMAN.

Opinion delivered June 24, 1929.

*Rowell & Alexander, Coleman & Gantt, S. A. Miller, Reinberger & Reinberger, Owens & Ehrman* and *G. DeMatt Henderson,* for appellant.

*Streett & Burnside* and *Williamson & Williamson,* for appellee.

SMITH, J. This appeal arises out of the efforts of nine creditors of Adolph Feibelman to enforce their demands against him. It will be unnecessary to set out how the various cases arose and were finally consolidated, as the controlling and decisive question in all of them is that of Feibelman's sanity. If he is in fact sane, or was sane when the demands were incurred, the creditors are entitled to have the relief which they pray, and the court from which this appeal comes need only take such action as will accomplish that result.

More than one hundred witnesses testified on the question of Feibelman's sanity, and we have before us a record of over twelve hundred pages, and numerous briefs

of counsel have abstracted and discussed this testimony, yet the answer to a single question will dispose of the entire litigation, and that is, was Feibelman sane when he incurred the indebtedness which his creditors seek to collect?

The number of witnesses on each side is about equal, but the preponderance of the expert testimony is that Feibelman was insane when these demands were incurred. The chancellor accepted this view, and entered a decree according with it, and this decree must be affirmed unless we can say that the finding is against the preponderance of the evidence.

It was the opinion of the medical experts that Feibelman had suffered from a form of insanity which was designated as manic depressive psychosis, and it was agreed by all the experts that an early symptom of this disease of the mind is that of an increased activity, physical and mental, on the part of the patient, with an exaggerated sense of importance and self-esteem, but these symptoms disappear as the disease progresses, and the feeling of exultation gives way to one of depression, and the patient becomes sullen, morose, lethargic, and has suicidal tendencies. These conditions result in the loss of control of the mental processes, and the patient who has them is insane.

The first of the experts who treated Feibelman professionally was a Doctor Schwab, who saw Feibelman for the first time on January 11, 1927, and treated him until February 4, 1927, during five days of which time Feibelman was in a hospital in St. Louis, and during the remainder of the time Feibelman was an office patient.

It would be almost interminable to set out the testimony seeking to prove and disprove that Feibelman was affected with this form of insanity. Many idiosyncrasies and peculiarities of the man were detailed which might be found in many men about whose sanity no question existed, if their lives were scrutinized as Feibelman's has been, but it is very earnestly insisted that the testimony shows far more than this, and that Feibelman's conduct

can be accounted for on the hypothesis only that he was an insane man.

Prior to 1926 Feibelman had been an aggressive and successful business man, but with the beginning of that year he closed out his mercantile business, and gave increased attention to his farming interests and to advancing money to others engaged in farming, and to buying and selling cotton, and to looking after his real estate holdings in the town of Eudora, where he resided. He carried over from 1925 a large quantity of cotton, and this. with his new ventures, required the use of a large amount of money. He was thought to be worth from $150,000 to $200,000, and his financial statement showed that he was, and his credit was good. He had never had any difficulty borrowing money. During 1925 he had been treated for both diabetes and pneumonia, but had apparently recovered in 1926, and about this time began the alleged exaggerated activity and improvident enlargement of his business and the orgy of spending money, which the experts testified were the acts of an insane man and the primary manifestations of the disease of maniac depressive psychosis.

In the hypothetical question to the experts, those who had seen Feibelman or had treated him professionally were asked, after taking into account their own observations of him, to assume as true the following facts: About January 1, 1926, a marked change occurred in Feibelman's habits and conduct; he "engaged in many lines of activity and in business ventures of very unsound and impractical character, foreign to his customs and habits of a lifetime;" that he "started numerous business ventures and undertakings which were far beyond his capital and capacity, and in some instances commenced things which he never even attempted to complete," so that, "in the course of but a few months his credit was exhausted, and he owed large sums of money which he could not pay, all resulting from a course of indiscriminate borrowing and buying at high prices things he did not need;" that, "with one or two automobiles

of the family at his disposal, he bought an expensive car for his individual use, with which he took long and extended trips all over the country in his orgy of buying and borrowing, not advising his family of his whereabouts for days;" that, after about nine months, "he sank into a state of great depression and despair, and walked the streets aimlessly, with bowed head, and passed friends of long standing without speaking to them, and would cry and moan without apparent cause, and required petting to induce him to attend meals and perform the ordinary household practices, and otherwise manifested a complete reversal of his former life and habits."

In answer to this question, five physicians, who had qualified as insanity experts, testified that the man described was insane, and incapable of transacting business. A single insanity expert expressed the contrary opinion, that the man was sane.

We cannot review the testimony, although we have carefully considered it, and we have concluded that the picture of Feibelman is overdrawn to the extent that an opinion based upon it assumes facts as true which the testimony does not establish.

The National Bank of Arkansas, of Pine Bluff, became Feibelman's principal creditor, and its business relations with him commenced February 26, 1926, and resulted from the fact that a Mr. McLeod, who was then the cashier of the bank, had previously been connected with the First National Bank of Lake Village, as cashier, and with the First National Bank of Eudora as a director, and had known and had transacted business with Feibelman for many years. Feibelman was a customer of the bank at Eudora, and that bank did not have sufficient capital to accommodate Feibelman's requirements, and the excess line of credit was handled through the Pine Bluff bank, which was the correspondent of the Eudora bank. Feibelman obtained his first loan from the Pine Bluff bank on February 26, 1926, which was for $5,000, for thirty days, and this loan was paid. On May 19, 1926, Feibelman borrowed $11,000, due in ninety days,

and on May 24 he borrowed an additional $5,000, due in ninety-one days. On May 29 he borrowed $4,000, and on June 18, $7,000, making a total indebtedness of $27,000. These loans were all unsecured, and bore interest at the rate of six per cent. per annum. They were made on the financial statements submitted by Feibelman, the accuracy and truth of which do not appear to be questioned.

On July 9 Feibelman borrowed an additional sum of $2,000, which was secured by a warehouse receipt for 35 bales of cotton, and on August 31 he borrowed $9,800, which was secured by warehouse receipts for 109 bales of cotton, and on September 24, 1926, he borrowed the sum of $6,450, which was secured by warehouse receipts for 86 bales of cotton. The notes for $2,000, for $9,800 and for $6,450 were paid. The remaining indebtedness of $27,000 was then evidenced by two notes, one for $6,000 and the other for $21,000. The $6,000 note was secured by warehouse receipts for 60 bales of cotton and the $21,-000 note by a deed of trust on certain real estate. In addition, Feibelman had carried a personal account with the Pine Bluff bank, which amounted to $16,000, and this was closed by a check for the balance then on hand, drawn December 18, 1926.

This is the money which Feibelman is said to have wasted in the orgy of borrowing and spending, and it is during the time that these loans were being made and spent that Feibelman so conducted himself that witnesses in his behalf testified that he was then insane. In this connection it is appropriate to say that the officers of the three banks concerned in lending this money testified that they did not know or suspect that Feibelman was insane, and it is and was their opinion that he was not insane.

Practically all of the indebtedness here involved was incurred prior to January 1, 1927.

The testimony as to the new ventures upon which Feibelman embarked and the manner in which he spent his money was detailed as fully by a Dr. Scott as by any other witness. Dr. Scott was a physician who had retired from the practice, and he knew Feibelman person-

ally and intimately. Dr. Scott was of the opinion that Feibelman was insane, because, at the beginning of 1926, he expanded his business operations and took on customers to whom he furnished money who were regarded by witness as unsafe. Feibelman bought a surplus of mules, and took more trips than he had been accustomed to taking; that he ventured into the sawmill business, and replaced an old gin with a new one, and built a hotel on the cost-plus basis, and did most of these things contrary to the advice of the witness.

It does not appear, however, that Feibelman was ever persuaded by any one to do anything which he had not previously determined to do, nor is there any showing that he was ever influenced, overreached or outtraded.

While Dr. Scott thought that Feibelman had used very bad judgment in taking on certain new customers, there is no testimony to the effect that he lost any money on any of them. It was shown that Feibelman bought a good many mules, but it was not shown that he had at any time paid more for any mule than it was worth, and there were witnesses who testified concerning the mules that they did not regard it as even bad judgment for a farmer to have a surplus of mules. Feibelman did sustain a loss on the sawmill, but not a disastrous one. The illusory prospects of operating a sawmill have beguiled many men whose sanity was not questioned. His embarkation in this enterprise was probably induced by the buildings hereafter referred to, including a cotton shed in connection with his new gin. His loss on the sawmill enterprise was augmented, if not caused, by the loss by fire of the mill purchased, which he thereafter rebuilt.

Feibelman did wreck his old gin and build a new one, but there was testimony that the old gin was operated as a wood burner, whereas the new gin generated power more cheaply, and the old gin was regarded as antiquated and about worn out. No loss was sustained on account of the building of the new gin; on the contrary it was sold at a substantial profit.

Dr. Scott thought Feibelman's action in building the hotel on a cost-plus basis was a very foolish one, yet the testimony shows that the building was worth its cost, and it was the opinion of the architect that money had been saved by building it in this manner. Persons concerned in the construction of the hotel testified that Feibelman manifested much shrewdness and mastery of detail in the course of the construction of the building, and attended to the letting of each contract for material. He lost no money on his hotel, and did not begin its construction until he had obtained a lease from a tenant which assured him a satisfactory return on his investment.

At the beginning of 1926, when Feibelman changed his business and began to give intensive attention to his planting interests, he bought two expensive saddle-horses, but he does not appear to have sustained any serious loss on these. He also bought a riding-habit, and this fact appears to have excited much comment and commiseration.

Having one automobile, Feibelman purchased another, and it is said he rode around more than he had ever done before. He drove to Hot Springs in February, 1926, with his family and a negro chauffeur, and, after spending several days at that resort, he returned by way of Camden and Pine Bluff. He drove to New Orleans, but he had done this as early as 1920. He made several trips to Vicksburg, and on one occasion stayed overnight without advising his family or any one that he intended to do so. He took a few other trips, but nothing unusual occurred in connection with them. One of his trips to Vicksburg was to attend a rodeo, in which his young son was to be a participant, and he bought his son expensive bridles and a complete and expensive cowboy outfit. He also bought for himself expensive bridles and saddles; but he was shown to have always been a lover of mules and saddle-horses.

He built an expensive henhouse, and a poker table so large that it could not be taken into the house except by removing a window. It was shown, however, that he

had long been accustomed to having social games of poker at his home, and witnesses testified that he had lost none of his proficiency in playing the game even after the time when other witnesses said he was insane.

One of the things done by Feibelman which appears to require explanation, to be consonant with sanity, was that he had the tails of a pair of mules clipped and then shaved with a safety razor, and their tails powdered with talcum powder, after which he drove the team practically all day over the town, and had pictures of himself and members of his family taken with the team and wagon. There appears, however, to be in Eudora an annual affair, known as "Clean-up Day," in which the entire population participates and which is treated as a holiday, and it was on this day that Feibelman disported with his mules.

There is much testimony to the effect that, as time passed in 1926, Feibelman became less buoyant and more depressed, and many persons who observed him became convinced that he had become insane. Others who were thrown in contact with him about the same time also noticed his changed demeanor, but their contact with him left the impression that his judgment was unimpaired and that he was a sane man.

After holding his 1925 cotton for a better market, Feibelman disposed of it at a substantial loss. The 1926 season opened with unusual prospects for a good crop, and a good crop was made, but, before it had been gathered, excessive rains reduced its grade, and the anticipated profits were not realized. The spring of 1927 witnessed the most disastrous and protracted overflow which had ever befallen that country, but it is unnecessary to consider Feibelman's mental condition after that time, because all of the indebtedness here in litigation was incurred prior thereto.

There appears to be but little dispute as to the law of the case, and the decisive question is the one of fact, whether Feibelman's mental condition was such as to prevent him from understanding the nature and conse-

quences of his acts in incurring the obligations upon which he has been sued. We have concluded that he was not insane, and the decree of the court holding otherwise will be reversed, and the cause remanded, with directions to enter a decree conforming to this opinion.